# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.  1:18-cv-

**KAZMIERA FRAZIER AND MATTIE WALKER**, individually and on behalf of all others similarly situated,

       Plaintiffs,

v.

**THE WESTERN UNION COMPANY, WESTERN UNION FINANCIAL SERVICES, INC., HIKMET ERSEK, and Various "Doe" Defendants, Including Western Union Officers, Directors, and Agents**,

       Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................ 3

II.  JURISDICTION AND VENUE ................................................................................... 6

III. PARTIES ......................................................................................................................... 7

    A.   Plaintiffs ................................................................................................................... 7

    B.   Defendants ............................................................................................................... 8

IV.  FACTUAL ALLEGATIONS ....................................................................................... 9

    A.   Western Union Operates and Controls a Global Money Transfer System ........ 9

    B.   Defendants Have Long Been Aware that the Western Union Money Transfer System Has Been Regularly Used to Defraud Innocent Customers ........................... 12

    C.   Defendants Were Part of the Scheme to Defraud ............................................. 15

    D.   The Amount of Actual Fraud is Significantly Higher than What Was Reported in, and Subject to, the DPA ................................................................................................. 29

    E.   Equitable Tolling .................................................................................................. 29

V.   CLASS ACTION ALLEGATIONS ......................................................................... 34

VI.  CLAIMS ALLEGED ................................................................................................... 37

    **FIRST CLAIM FOR RELIEF** ..................................................................... 37
        Violations of 18 U.S.C. § 1962(c) and (d) ..................................... 37

    **SECOND CLAIM FOR RELIEF** ............................................................... 40
        Violations of 18 U.S.C. § 1962(b) and (d) ..................................... 40

    **THIRD CLAIM FOR RELIEF** .................................................................. 42
        Violations of Colo. Rev. Stat. Ann. § 18-17-104(3) and (4) ........ 42

    **FOURTH CLAIM FOR RELIEF** .............................................................. 45
        Violations of Colo. Rev. Stat. Ann. § 18-17-104(2) and (4) ........ 45

    **FIFTH CLAIM FOR RELIEF** ................................................................... 46
        Violations of Colo. Rev. Stat. § 18-4-405 ..................................... 46

    **SIXTH CLAIM FOR RELIEF** ................................................................... 48
        Negligence ........................................................................................ 48

    **SEVENTH CLAIM FOR RELIEF** ............................................................ 49
        Unjust Enrichment.......................................................................... 49

    **EIGHTH CLAIM FOR RELIEF** ............................................................... 50
        Conversion ........................................................................................ 50

VII.  JURY DEMAND ......................................................................................................... 51

VIII. REQUEST FOR RELIEF .......................................................................................... 51

Plaintiffs Kazmiera Frazier and Mattie Walker (collectively, "Plaintiffs") bring this Complaint, individually and on behalf of the other members of the below-defined class they seek to represent (the "Class") against Defendants, The Western Union Company, Western Union Financial Services, Inc., Hikmet Ersek, and various Doe Defendants, including Western Union officers, directors, managers, employees, and agents (collectively "Defendants," unless otherwise identified), for violations of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, Title IX, "Racketeer Influenced and Corrupt Organizations Act" ("RICO") (codified at 18 U.S.C. §§ 1961-1968), violations of Colorado Organized Crime Control Act ("COCCA"), violations of Colorado's theft statute, negligence, unjust enrichment, and conversion. The allegations set forth herein are based upon personal knowledge as to matters concerning Plaintiffs and their own acts and upon information and belief as to all other matters. The allegations that are not based on Plaintiffs' personal knowledge result from Plaintiffs' counsel's investigation.

## I.    INTRODUCTION

1.    The Western Union Company ("Western Union" or the "Company"), along with various of its officers, directors, managers, employees, and agents, has admitted to rampant fraud, beginning as early as 2004, cheating its customers out of hundreds of millions of dollars.

2.    On January 19, 2017, the United States Department of Justice ("DOJ") announced a Deferred Prosecution Agreement (the "DPA") with Western Union, and the United States Federal Trade Commission filed a complaint against Western Union (the "FTC Complaint"). These documents provided detailed facts confirming that Western Union and certain of its officers, directors, managers, employees, and agents, since at least as early as 2004, defrauded

Western Union customers out of hundreds of millions of dollars through the Western Union Money Transfer System.[1]

3.      The facts revealed in the DPA and the FTC Complaint show that Defendants were not only aware that third-party fraudsters (hereinafter, "Fraudsters") such as con artists and Internet scammers, routinely used the Western Union Money Transfer System to facilitate their scams, but that Defendants, for the purpose of lining their own pockets from the fees associated with fraudulent transactions, were essential actors in an overarching scheme to defraud its customers—including Plaintiffs and the other Class members—through the Western Union Money Transfer System operated by Defendant Western Union Financial Services, Inc. ("WUFSI").

4.      Defendants decided that they would not take adequate steps to prevent fraud, which would have included terminating agents known to be complicit with Fraudsters; rather, Defendants resolved that they would continue using the Western Union Money Transfer System to defraud innocent customers—including Plaintiffs and the other Class members—all for the sake of corporate profits.

5.      In January 2018, Western Union entered into a Consent Order with the New York State Department of Financial Services (the "New York Consent Order") that revealed further facts showing that that various senior Western Union executives purposefully and knowingly perpetuated wire fraud.[2]

6.      Plaintiffs and each of the other Class members were victims of Western Union's wire fraud, as described in more detail below.  Plaintiffs each contacted Western Union for

---

[1] To ensure accuracy, significant portions of the DPA and the FTC Complaint are paraphrased and used verbatim herein.  True and correct copies of the DPA and FTC Complaint are attached hereto as Exhibits A and B.

[2] A true and correct copy of the New York Consent Order is attached hereto as Exhibit C.

assistance after they were defrauded through Western Union.  In each instance, Western Union misled them by asserting that the Company had nothing to do with the fraud and there was nothing more that the Company could do for Plaintiffs.  Due to Western Union's misrepresentations, Plaintiffs were ignorant of Western Union's involvement in the scheme to defraud through the Western Union Money Transfer System, and, with no way of identifying or locating the Fraudsters, Plaintiffs had exhausted any possible diligence they could perform into recovering their losses.

7.    The facts showing Western Union's involvement in the systemic scheme to defraud innocent consumers were unknown—and could not have been known—until no earlier than January 19, 2017, when the DPA and FTC Complaint became public, and revealed the nature of Defendants' actions.  The facts included within the DPA and FTC Complaint all came from confidential, internal Western Union documents that were not available to Plaintiffs and the other Class members.

8.    Neither Plaintiffs nor the other Class members were ever privy to the facts or Western Union documents that served as a basis for the facts, admissions, and allegations set forth in the DPA, the FTC Complaint, and the New York Consent Order.

9.    Due to the DOJ and FTC investigations, Western Union agreed to forfeit $586 million and make the funds available to individuals who were defrauded through the Company from at least 2004 to 2017.

10.    As is evident from the DPA, however, this $586 million is insufficient to cover the damages of every person who was defrauded through the Company from 2004 to 2017. Moreover, Western Union was not given any release from civil RICO liability through either the DOJ and FTC settlements, or the New York Consent Order.  Now that the true nature of

Defendants' involvement in their losses has been revealed, Plaintiffs and the other Class members are entitled to seek and obtain a full recovery of the amounts that they lost, and the amounts available under the federal and state RICO statutes asserted herein.

11.    By this Complaint, Plaintiffs seek legal and equitable relief for themselves and the other Class members, in the manner set forth herein, based on the facts and criminal violations that Western Union has already *admitted* are true and correct.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000,[3] and is a class action in which there are at least one hundred Class members and Class members are citizens of states different from Western Union.  Further, more than two-thirds of the Class members reside in states other than the states in which Western Union is a citizen.  Plaintiffs are both citizens of the State of Georgia.  Western Union is a citizen of Colorado and is registered to do business in every state in the United States.

13.    This Court also has jurisdiction over this matter under 28 U.S.C. § 1331, and 18 U.S.C. §§ 1961, 1962, and 1964.

14.    This Court has personal jurisdiction over Defendants, and venue is proper, under 18 U.S.C. § 1965 because Western Union transacts affairs in this District, and such jurisdiction serves the interests of justice, including the avoidance of multiple trials, unnecessary costs, excessive burden on witnesses, and the possibility of inconsistent verdicts.

15.    Under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims alleged herein because each of those claims is derived from a common

---

[3] In determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, Class members' claims are aggregated.  28 U.S.C. § 1332(d)(6).

nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

## III.  PARTIES

A.  *Plaintiffs*

16.    Kazmiera Frazier is currently a resident of Warner Robins, Georgia.  In 2005, while living in New Jersey, she was defrauded through a Western Union location in Newark, New Jersey.

17.    Ms. Frazier was fraudulently notified over the telephone that she had qualified for a Pell Grant, and needed to wire $175 through Western Union as a processing fee.  She wired those funds through a Western Union location in Newark, New Jersey.  After wiring the $175, the Fraudster who falsely promised the Pell Grant then told Ms. Frazier that she needed to wire additional funds in order to receive the Pell Grant.   At that point, Ms. Frazier realized that she was possibly the victim of a scam.

18.    Upon that realization, Ms. Frazier promptly contacted Western Union and requested that it stop the transfer of her $175 wire.  Western Union told Ms. Frazier that it was too late, that Western Union couldn't do anything to help her, and that the problem was not Western Union's responsibility, because the scam was perpetrated by a third party.  Ms. Frazier had no reasonable way of locating and holding the Fraudster accountable.  Ms. Frazier did not know, and had no way of knowing, that Western Union was complicit in, or had recklessly or negligently enabled, the fraud.

19.    Ms. Frazier was never directly notified that she could be reimbursed as part of the DPA, and has not been reimbursed as part of the DPA.

20.    Mattie Walker is a resident of Macon, Georgia.  In 2005, while living in Florida, Ms. Walker was defrauded through Western Union in Fernandina Beach, Florida.

7

21.    Ms. Walker read a Craigslist advertisement for a job as a "secret shopper."  The purported job required her to report on the customer service of various businesses.  After an initial assignment to review the service of a Wal-Mart, Ms. Walker was told to review a Western Union.  The Fraudster behind the purported "secret shopper" job sent Ms. Walker a check for $2,400 and told her to wire that same amount back to them through Western Union.  The Fraudsters stopped payment on their check before the funds could reach Ms. Walker's account.  But Ms. Walker had already wired $2,400 through a Western Union in Fernandina Beach, Florida.  Upon realizing that payment had been stopped on the check that the Fraudsters had sent to her, Ms. Walker recognized that she was possibly the victim of a scam.

22.    Upon that realization, Ms. Walker promptly contacted Western Union and asked that it stop the transfer of her $2,400 wire.  Western Union told Ms. Walker that it was too late, that Western Union couldn't do anything to help her, and that the problem was not Western Union's responsibility, because the scam was perpetrated by a third-party.  Ms. Walker had no reasonable way of locating and holding the Fraudster accountable.  Ms. Frazier did not know, and had no way of knowing, that Western Union was complicit in, or had recklessly or negligently enabled, the fraud.

23.    Ms. Walker was never directly notified that she could be reimbursed as part of the DPA, and has not been reimbursed as part of the DPA.

**B.    *Defendants***

24.    The Western Union Company, is a Delaware corporation with its principal place of business located in Englewood, Colorado.

25.    Western Union Financial Services, Inc. ("WUFSI") is a Delaware corporation with its principal place of business located in Englewood, Colorado.

8

26.     Hikmet Ersek has been the Chief Executive Officer of Western Union since 2010. He is an individual residing in the State of Colorado.

27.     The "Doe" Defendants are yet-to-be-identified officers, directors, managers, employees, and agents of Western Union.  They will be specifically identified during the course of discovery in this case.

## IV.   FACTUAL ALLEGATIONS

A.     *Western Union Operates and Controls a Global Money Transfer System*

28.     Western Union is a financial institution and one of the largest money services businesses in the world.  Western Union employs approximately 10,000 individuals worldwide.

29.      In 2016, Western Union reported total revenues of $5.4 billion, and completed 791 million transactions in over 200 countries, including more than $80 billion in principal between consumers.

30.     Western Union transmits and converts money.  It earns revenue by charging its customers a fee based on the money transfer amount and the destination location

31.     In order to conduct its money transfer business, Western Union is registered with the Financial Crimes Enforcement Network ("FinCEN"), and subject to its requirements and duties.

32.     Western Union's money transfer business is based on its "Money Transfer System," which it operates and controls.

33.     Western Union's Money Transfer System is an electronic network, which uses interstate and foreign wires to complete money transfers.  Consumers transmit money around the world using Western Union's Money Transfer System.

34.     All Western Union money transfers flow through the same global Money Transfer System.

35.    WUFSI operates a network of approximately 550,000 agent locations in 200 countries and territories worldwide.  As a part of the required anti-money laundering program, WUFSI was required to take reasonable steps to guard against the flow of illicit funds.  In January 2017, WUFSI was fined by Financial Crimes Enforcement Network ("FinCEN") for violating this requirement by failing to conduct adequate due diligence.  Consequently, certain agent locations and outlets that WUFSI suspected were involved in fraud and money laundering were able to continue to use WUFSI's money transfer system to facilitate their illicit activity.

36.    "Western Union Agents" (or "Agents") are generally independent individuals or entities that own and/or operate Western Union Agent locations pursuant to a contract with Western Union.  These Agents are authorized to offer Western Union's money transfers to consumers.

37.    To send money through Western Union, consumers go to a Western Union Agent and provide the Agent with the sender and payee names, the transfer amount, and the location where the money is to be sent.  Consumers also provide the Agent with the funds necessary to cover the transfer amount and the fee charged by Western Union.

38.    To receive money through Western Union, the payee must typically appear in person at a Western Union Agent location and provide the Agent with identifying information, as well as the name of the sender and the expected transfer amount.  To complete the transfer to the payee, the paying Agent transmits the payee's information to the Western Union Money Transfer system via international or interstate wire.

39.    Western Union's contracts with its Agents require its Agents to comply with all applicable laws, including anti-money laundering laws.

40.     Western Union's contracts further provide Western Union with the right to immediately suspend or terminate Agents and Agent locations.  Western Union has the right to do so unilaterally and anywhere in the world for a variety of reasons, including compliance reasons.

41.     Agents are required to keep records for all transactions, provide them to Western Union upon request, and cooperate with any audit or review by Western Union.

42.     Western Union's contracts also provide Western Union with the right to inspect and audit its Agents' books and records to monitor compliance with the agreement, applicable law, and Western Union's policies.

43.     Western Union pays Agents a commission for money transfers.  It also provides bonuses and additional money to Agents for increased transaction volume.

44.     Agents sometimes have sub-agents ("Sub-agents") that carry out money transfers using the Western Union Money Transfer System.  Western Union's agreements with its Agents give Western Union the right to suspend and terminate Sub-agents.

45.     Western Union has the ability to refuse or cancel any money transfer through its Money Transfer System.

46.     Once Western Union's Agents have paid out the funds, Western Union's policy typically is that the sender cannot obtain a refund from Western Union of either the amount transferred or the money transfer fee, even if the sender was a victim of fraud or the money transfer was paid out to someone other than the intended recipient.  The policy even applies if the Western Union Agent was complicit in the fraud, engaged in suspicious activity, or failed to follow Western Union's policies and procedures when processing the money transfer.

B.       *Defendants Have Long Been Aware that the Western Union Money Transfer System Has Been Regularly Used to Defraud Innocent Customers*

47.       On its website, Western Union states:  "Smart People Fall For Scams Every Day: Con artists use good people like you, and good money transfer companies like Western Union, to steal money."

48.       Indeed, Western Union provided an essential service to Fraudsters by permitting them access to Western Union's Money Transfer System.  Exploiting this service, Fraudsters have stolen, and continue to steal, millions of dollars from innocent consumers.  This fraud has also generated substantial revenue for Western Union and its Agents, in the form of transaction fees and foreign currency exchange fees.

49.       Since at least January 2004, Defendants have been aware, based on hundreds of thousands of complaints, internal reports and records, and repeated warnings from government agencies around the world, that Fraudsters have regularly used Western Union's Money Transfer System to fraudulently obtain funds from their victims.

50.       Western Union has conducted reviews and investigations, and has generated reports, related to consumer fraud involving its Money Transfer System.  This information, available only to Western Union, showed that the Company was aware of high levels of consumer fraud involving Western Union Agents.

51.       Defendants were aware of specific Agents and Sub-agents that were the subject of abnormally high levels of fraud complaints; and were further aware knew that many of its Agent locations with high fraud had:  (a) violated Western Union's anti-fraud policies and procedures; (b) engaged in suspicious activities; and (c) been complicit, or likely complicit, in fraud.

52.    Defendants were aware of Agent locations—particularly overseas Agent locations—that processed high levels of fraud transfers from U.S. victims, including certain Agent locations that Defendants suspected were complicit in the fraud scheme.

53.    Western Union identified corrupt Western Union Agents through various means, including internal Consumer Fraud Reports, transaction monitoring, and other reports generated by Western Union analysts reviewing transactions that highlighted Agent locations exhibiting evidence of complicity in fraud.

54.    Defendants also knew that certain Agent locations were actively engaged in fraud using Western Union's Money Transfer System because some of those locations were prosecuted for their criminal activity.  For example, between 2001 and 2012, 28 Western Union Agent owners, operators, or employees were charged in the U.S. District Court for the Middle District of Pennsylvania for their participation in fraud or money laundering using Western Union's Money Transfer System.

55.    In addition, for many years, law enforcement agencies in the United States and throughout the world warned Western Union that its Money Transfer System was being used to perpetrate consumer fraud and that Western Union was not adequately addressing the problem.

56.    In or around 2002, multiple state Attorneys General issued subpoenas to Western Union in conjunction with their investigations of the use of Western Union's Money Transfer System by fraudulent telemarketers.

57.    In correspondence dated October 1, 2002, the Vermont Attorney General's Office informed Western Union about alarming statistics regarding telemarketers using Western Union's Money Transfer System for fraudulent schemes.

58.     Since at least June 2011, the Minnesota Attorney General's Office has warned Western Union's President and Chief Executive Officer, Defendant Hikmet Ersek, that "each year thousands of consumers are defrauded through use of your company's services," and that "[g]iven your firm's apparently continuing inability or unwillingness to detect and prevent such wire transfer fraud, it would seem appropriate to" issue refunds to consumers.  In response, Western Union typically has refused to issue any refunds to the victims after the funds were transferred.

59.     In October 2011, multiple state Attorneys General issued subpoenas to Western Union in connection with investigations of fraudulent telemarketers' use of Western Union's Money Transfer System.  The Vermont subpoena stated that it had "reason to believe that Western Union has provided substantial assistance to fraudulent telemarketers in the form of access to its money transfer system, despite knowing, or consciously avoiding knowing, of the fraud, in violation of the Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a)."

60.     Further, Defendants were aware of systemic fraud because some (but not all) defrauded consumers contacted Western Union to report on, and inquire about, fraud-induced money transfer issues.

61.     When victims of fraud through Western Union's Money Transfer System complained to Western Union, it recorded these complaints and generated Consumer Fraud Reports ("CFRs").  The CFRs contained detailed information about the victims, the transactions, and the Agent locations that paid the transfers. Western Union maintained a database of all CFRs.

62.     Western Union's CFR database revealed rampant fraud perpetrated through its Money Transfer System.  According to Western Union's own confidential records, which it concealed from the public, and were only made public through the DPA and the FTC Complaint:

a.     Between January 1, 2004, and August 29, 2015, Western Union received at least 550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044. Over 80% of the complaints in the database were from U.S. consumers.  The average individual consumer fraud loss was approximately $1,148.  This is more than three times the amount of Western Union's average money transfer for the years 2010 through 2014—approximately $346—and more than seven times the amount of Western Union's median money transfer for the same period;

b.     Since at least 2004, the United States has been the top country for fraud payouts and has generated over three times the number of complaints as the next highest country. Over $128.2 million in reported fraud has been paid out in the United States since 2010, and Western Union has received more than 34,000 fraud complaints about transactions totaling over $21.2 million since 2014; and

c.     Western Union received additional complaints, which were not recorded in the database, including at least 8,497 complaints in 2005 regarding fraud-induced money transfers, which totaled at least $14,478,365.

63.     When a victim reported fraud to Western Union in October 2012, she was told by a Western Union employee that she was "wasting [her] time" reporting the fraud because "there are thousands of these complaints laying on the desk and nothing gets done."

**C.     *Defendants Were Part of the Scheme to Defraud***

64.     With knowledge of rampant ongoing fraud within the Money Transfer System, Defendants sent wires as part of scheme to defraud across interstate and international borders.

Defendants purposefully facilitated Fraudsters' actions, including by failing to take steps to prevent Fraudsters from engaging in fraud, so as to benefit from the fees the Fraudsters generated for Western Union.

65.    At the most blatant level, certain Agents and Sub-agents knowingly engaged with Fraudsters to steal from innocent customers.  Corrupt Agents would (a) conceal the true identities of the fraudsters; (b) fail properly to collect and record all of recipients' IDs or biological information, and (c) knowingly record obviously false information such as false addresses, telephone numbers, and personal identification document information, into the Western Union Money Transfer System to pay the fraudulently-induced transfers to the Fraudsters or retransfer the funds to other complicit Western Union Agent locations elsewhere. The corrupt Western Union Agents would take a cut of the ill-gotten proceeds.  In all such scenarios, Western Union received its transaction fees.

66.    Thirty-nine (39) Western Union Agents have been charged in the United States with defrauding consumers through various schemes including fraudulent sweepstakes, advance fee loans, fake business opportunities (including "secret shopper" or work-at-home scams), emergency or person-in-need scams, and Internet purchase offers.  The charges included conspiracy to commit mail fraud, wire fraud and money laundering.  Most of the Agents have already pleaded guilty or have been convicted of the charges.

67.    Western Union Agents and Sub-agents also assisted or supported Fraudsters by paying out funds in violation of Western Union's policies and procedures.

68.    Defendants failed to promptly investigate, suspend, and terminate Agents and Sub-agents that exhibited high levels of consumer fraud, some of which were likely complicit in

frauds, or which ignored such frauds by failing to comply with Western Union's policies and procedures.

69.    Defendants permitted Agents and Sub-agents that had processed hundreds of thousands of dollars, or even millions of dollars, in confirmed and potential fraud to continue operating for months or even years, despite highly suspicious activities and indications of complicity.

70.    Defendants knew that the Bank Secrecy Act ("BSA") required Western Union to monitor international Agents and take corrective action against Agents violating laws or regulations.   Nevertheless, Defendants purposefully failed to implement or execute effective disciplinary policies, and act on its employees' recommendations to discipline, suspend, or terminate international Agent locations.   As a result, complicit Western Union Agent locations remained open for years and processed additional fraud transactions to the detriment of Plaintiffs and the other Class members.

71.    Nigerian scammers, for example, are at the center of many international frauds. Western Union's Agent Locations in Nigeria pay out large numbers of fraud-induced money transfers and engage in other suspicious activities, and approximately 86.7% of those transfers came from the United States.  In February 2012, the U.S. Secret Service warned Western Union that: its services were "widely used by Nigerian scammers and other criminal elements overseas"; "a person in America can easily be robbed by someone in a foreign country and there is almost no possibility to recover that fraud loss"; its "services are widely used for online scams in the US"; and Western Union "is a complete and almost total safe haven for the criminal element to freely launder illegal proceeds without detection."   Despite repeated reviews and

17

investigations of Western Union's Agent locations in Nigeria, as of October 2015, Defendants rarely, if ever, terminated them for consumer fraud.

72.    Similarly, from July 2009 to as recently as August 2015, an Agent location in Malaysia made payouts relating to at least 252 fraud complaints totaling $389,061. Although the Agent appeared on fraud reports and was reviewed for fraud many times between 2010 and 2014, the Agent was not terminated. In fact, in 2014, Western Union executives approved the reactivation of that Agent despite being informed that confirmed and potential fraud, as well as suspicious activity, amounted to approximately 54% of the agent's pay volume.

73.    Likewise, an Agent location in Greece made payouts relating to at least 106 fraud complaints totaling $193,696 from July 2013 to October 2014. From 2012 to 2014, the agent paid out $5.4 million in money transfers, of which approximately $3.7 million were for $1,000 or more. That Agent operated for over two years despite appearing on internal fraud or Agent complicity index reports multiple times and being reviewed for fraud at least three times with findings of suspicious activities.

74.    And from September 2013 to August 2015, an Agent in Thailand paid out money transfers associated with at least 1,197 complaints totaling $425,409, of which 336 complaints totaling $117,290 were paid out in April 2015 alone. That Agent was allowed to continue operating, despite a review in 2013 finding that 63% of the Agent's transactions in two months amounted to confirmed fraud and questionable activity, and a review in 2015 associated with three of its agent ID numbers finding that 25% of its activity in one month, amounting to over $1.2 million, was connected to fraud.

75.    Defendants purposefully ignored useful suggestions and recommendations from employees and representatives of law enforcement agencies. These types of measures include,

but are not limited to: (a) bolstering ID requirements for sending or receiving money transfers, such as by imposing more robust ID requirements; (b) requiring the collection of additional biographical information; implementing more controls for noncompliant transactions or potentially fraud-induced money transfers, including, but not limited to, transactions with data integrity issues and to high-risk countries; (c) improving the company's handling of, and ability to receive, complaints about fraud worldwide; and (d) improving its interdiction system to be more effective in blocking money transfers associated with consumer fraud, including, but not limited to, by permanently blocking payouts to the recipients of fraud-induced money transfers.

76. Western Union employees recommended specific actions, policies, and procedures to take action against potentially complicit Western Union Agent locations, but Defendants rejected those recommendations. For example:

a. <u>Global Guidelines</u>: As early as 2004, an employee in Western Union's Corporate Security Department prepared a set of "draft" Global Guidelines for disciplining and suspending Western Union Agent Locations worldwide that processed a materially elevated number of reported fraud transactions. In these guidelines, the employee proposed mandatory review of any Agent location that paid ten CFRs within 60 days. The Corporate Security employee further proposed automatically suspending any Agent location that paid five or more transactions reported as fraud within 60 days of a review. In other words, the Corporate Security employee proposed automatically suspending any Agent location that paid fifteen (15) CFRs within 120 days. Western Union rejected the proposed Global Guidelines and did not implement them.

b. <u>60-Day Fraud Report</u>: As early as 2005, Western Union's Corporate Security Department used CFRs to generate a regular 60-Day Fraud Report, which identified

Agent locations that processed five or more CFRs within 60 days. Corporate Security distributed the report to a broad group of Western Union employees, including Western Union senior employees, and cautioned that Agent locations that did not "drastically reduce" payments of transactions identified in CFRs within 60 days would be suspended. Even though Corporate Security threatened to suspend Agent locations, thousands of complicit Western Union Agent locations—particularly international locations—appeared on the 60-Day Fraud Report multiple times with increasing CFR payments without Western Union taking disciplinary action against them.

        c.    <u>Agent Fraud Complicity Programs</u>: In January 2008, two Western Union departments separately proposed methods to discipline potentially complicit Western Union Agent locations. One proposal specifically warned against the influence of sales employees on any Agent location disciplinary process because sales employees' "compensation is often based on agent performance—so they … see no reason good enough to hold their agent responsible" for fraud transactions. A Western Union senior vice president said she was "coordinating the many functions in the company that look at … data which might indicate an agent, a location, or an agent employee is engaged in illegal activities." She was "focused on … analysis of the consumer fraud complaints … from a risk-based approach, separating out agent locations … that are complicit and need to be suspended.... [And] the need to enhance processes" at Western Union. Western Union's then-Chief Compliance Officer wrote, "I am in favor of this proposal with two caveats: The necessary resource commitment - the more we look [for Agent involvement in fraud schemes] the more we find… and I'd like this communicated in the appropriate way so that everyone understands their roles and responsibilities." Western Union failed to implement either of the proposed disciplinary programs.

77.    Had Western Union implemented the proposed Global Guidelines or the other proposed policies listed above, it could have prevented significant fraud losses to victims. Specifically, the proposed Global Guidelines would have resulted in potential suspensions and terminations against more than 2,000 Agent locations worldwide.    Had Western Union implemented the proposed Global Guidelines, it would have stopped these same Agent Locations from processing more than $174 million in reported fraud losses.

78.    Further, as stated in the January 2018 New York Consent Order, Western Union management intervened, on numerous occasions, to obtain more lenient treatment for certain New York Agents, which were some of the Company's highest fee generators.

79.    For example, a Western Union compliance employee explained by e-mail to a business executive that compliance staff would give "plenty of notice before they conduct reviews with agents who have 2 or more probations," apparently maximizing the chance for such Agents to avoid more serious discipline, and a corresponding suspension or cessation of fee revenue.

80.    As another example, rather than suspend a high fee-generating New York Agent for multiple legal and policy violations, Company management actually paid the Agent a $250,000 bonus to renew the contract with Western Union.

81.    In fact, Western Union refused to terminate Agents and Sub-agents engaged in fraudulent conduct despite agreeing to do so.

82.    In November 2005, Western Union entered into an agreement with the Attorneys General of 47 states and the District of Columbia (the "NAAG Agreement") to resolve the states' investigations into fraud transactions at Western Union.    As part of the NAAG Agreement, Western Union promised to terminate any Agent—domestic or international—that was

"complicit in fraud-induced transfers or knowingly ignore[d] such fraud, or, if certain employees of the agent or subagent are the [sic] complicit ignoring parties, insist upon termination of such employees as a condition to continued agent or subagent status."  Western Union also agreed to suspend or terminate Agents that failed to take reasonable steps to reduce fraud transactions.

83.     After entering into the NAAG Agreement, however, Western Union neither implemented nor maintained effective policies or procedures to suspend or terminate international Agents that processed fraud payments.

84.     Further, in some cases, Defendants installed Agents or Sub-agents that Western Union had previously terminated, that were previously suspended or terminated by MoneyGram for fraud, or that were concurrently operating as MoneyGram agents (in violation of Western Union's Agent agreements).

85.     For example, in 2006, a Western Union Agent in College Park, Georgia was suspended due to consumer fraud, but began operating again in 2007 from the same address, but with a different business name and agent ID number, until the Agent was suspended for fraud again.  The Agent then became a MoneyGram agent and continued to generate fraud-induced money transfers for approximately one year before being terminated by MoneyGram.  After that, the Agent returned to Western Union in 2009, and began operating for a third time with the same name and at the same location.  A review in 2012 revealed that approximately 80% of its payouts were attributable to fraud, and it was later terminated.  In 2015, the Agent began operating again as a Western Union Agent from the same address, using a similar name, but with a new agent ID number, and once again, it began generating fraud complaints.

86.     As another example, after suspending an Agent location in the Philippines due to high levels of fraud, Western Union discovered that the owner of the location had been a high-

volume sender to Nigeria who Western Union had blocked just two months before the location began operating. During the three-month period before the Agent location was suspended, it generated at least 173 fraud complaints totaling $316,400, and paid out over $1.2 million in suspected fraud.

87.    Moreover, despite receiving information from consumers, their family members, or law enforcement representatives about fraud-induced money transfers, Defendants did not record information about all of those money transfers in Western Union's complaint database.

88.    Western Union uses the information in its complaint database to administer its anti-fraud program, so it is imperative that the database is accurate and complete. For example, Western Union uses this information to: (a) monitor and identify Agents and Sub-agents that may be complicit in frauds; (b) create automated rules regarding particular corridors (*e.g.*, limiting the number and amount of money transfers to receivers); and (c) interdict individuals who are the victims or the perpetrators of frauds. Therefore, Defendants' failure to keep accurate and complete records of fraud-induced money transfers has impeded Western Union's efforts to detect and prevent such fraud from occurring.

89.    Although Western Union employees have brought the underreporting of fraud-induced money transfers in the company's complaint database to the attention of those responsible for maintaining the database, Defendants have failed to take adequate corrective action, if any, to address the problem.

90.    Further, although FinCEN, the primary administrator of the BSA, requires money services businesses like Western Union to file Suspicious Activity Reports ("SARs") relating to fraud, Defendants have, in many cases, failed to file SARs on, and identify as the subject of

SARSs, particular Agent locations in foreign countries that have processed high levels of fraud-induced money transfers sent by U.S. consumers and exhibited other suspicious activities

91.    In addition to its anti-fraud program, Western Union is required by the BSA to have an effective AML program to guard against money laundering, including, but not limited to, guarding against the flow of illicit funds, such as funds derived from fraud.  As part of its AML program, Western Union has developed "Know Your Agent" guidelines and policies, and policies and procedures for monitoring transaction, customer, and agent activity for risks, including suspicious activity and agent complicity.  Western Union's AML program relies heavily upon its agents to have their own AML programs.  In many cases, Defendants have failed to implement effective AML policies and procedures pertaining to consumer fraud, thereby making Western Union's Money Transfer System more vulnerable to such fraud.

92.    Further, up until in or around December 2011, Defendants did not provide any toll-free number that consumers in countries other than the United States and Canada could use to report fraud and to try to stop the payout of a fraud-induced money transfer.  For example, Western Union did not provide fraud hotlines for consumers in Germany, Mexico, Spain, and the United Kingdom until December 2011, for consumers in Australia, Japan, and Malaysia until February 2012, and for consumers in Austria, Belgium, Luxembourg, and Switzerland until August 2012.

93.    Further, Defendants made it difficult for employees to take meaningful action to detect and prevent consumer fraud, including by failing to provide employees with sufficient information or resources, including complete records of consumer fraud complaints, as well as information about law enforcement contacts, investigations, and actions.  For many years,

departments within Western Union responsible for handling consumer fraud issues failed to routinely share consumer fraud information with other groups or departments.

94.     Further, for many years, the department at Western Union primarily responsible for conducting background checks was not provided with sufficient information to conduct thorough background checks of every prospective and existing Agent and Sub-agent, such as information from law enforcement, information about investigations of Agent locations, and access to consumer complaints.

95.     Further, although Western Union has ostensibly relied on its Agents to comply with Western Union's anti-fraud and AML programs, and to oversee the activity of their own Sub-agents and locations, Defendants have not provided Agents with the information necessary to conduct effective fraud reviews and to detect and prevent consumer fraud, including the potential complicity of particular Agent locations.  For example, Western Union typically has not shared with the Agents themselves complaints it has received about fraud-induced money transfers processed by the Agent locations.  Therefore, despite being tasked with overseeing the conduct of their own Sub-agents and Agent locations, Western Union's Agents, in many cases, are unaware of the nature, details, history, and volume of complaints involving the Agent locations.

96.     Defendants have also not effectively trained, monitored, and reviewed Agents and Sub-agents to detect and prevent consumer fraud and to prevent potential complicity at Agent locations.

97.     Agents and Sub-agents responsible for processing fraud-induced money transfers were ignorant of Western Union's anti-fraud and policies and procedures, including detecting and preventing fraud, properly recording customers' biographical information and IDs, and

addressing suspicious activities. Western Union also did not have an adequate and effective system in place to ensure that Agents are knowledgeable in these areas. As a result, in many instances, Western Union's high-fraud Agent locations have violated the Company's policies and procedures by failing to collect proper IDs or biographical information from recipients of money transfers, accepting improper forms of IDs, or recording obviously incorrect or fictitious ID information into Western Union's system.

98.    Despite Western Union's 2005 Agreement with the States, which required Western Union to "commence a program of person-to-person or telephone training at agent locations known to have a materially elevated level of outgoing or incoming fraud-induced transfers sent from the United States to anywhere except Mexico," Western Union failed to implement such a program at many such Agents locations. For example, with respect to many of its foreign Agent locations that have exhibited high fraud levels, Western Union's practice was only to train the master Agents and not to conduct person-to-person or telephone training at the Agent locations that exhibited high levels of fraud.

99.    Western Union failed to conduct adequate and routine onsite compliance reviews of its Agent locations worldwide. Western Union often relied on its master Agents to conduct reviews, but failed to ensure that those master Agents were conducting adequate and effective oversight of their subagents and Locations. In other cases, Western Union's employees were unable to conduct independent, on-site reviews of certain Locations because they were in areas considered too dangerous to visit. Western Union also failed to conduct adequate and routine onsite reviews of many of its independent Agents.

100.    For many years, consumer fraud was not even routinely addressed in Western Union's compliance reviews of Agents. Even after it was added to the list of topics for these

reviews, consumer fraud for many years was addressed only in a cursory manner. In addition, in many instances, Western Union employees who conducted compliance reviews were not provided with information about fraud complaints involving the Agents being reviewed, so the employees could not adequately address issues related to the complaints in their reviews.

101.    Further, in many instances, Western Union employees responsible for monitoring the activities of Agent locations were not provided with sufficient information or resources to adequately monitor Western Union's Agents, Sub-agents, and Agent locations. For example, in some instances, Western Union assigned more than one agent ID number to a single Agent or Sub-agent without providing Western Union employees with the means to easily locate all of the Agent's or Sub-agent's ID numbers in Western Union's system. Western Union similarly failed to provide its employees with the means to easily identify Agents or Sub-agents with common ownership. In addition, in some cases, Western Union's employees were unable to identify problematic Agents because Agents have not used unique IDs when processing money transfers. Western Union's employees also sometimes have not had complete and historical information about particular Agents and Sub-agents, including information about all fraud complaints, prior reviews, investigations, and internal reports related to fraud, as well as transactional activity. Therefore, Western Union employees responsible for monitoring Agent activity may not have been aware of all relevant information.

102.    Western Union and its Agents also failed to provide adequate and effective warnings to consumers about the fraud occurring through its Money Transfer System. Although Western Union provides some warnings on the first page of "send" forms located at some of its Agent locations, in many cases, these warnings are unclear and inconspicuous.

103.    In addition, Western Union's Agent locations failed to provide routine verbal warnings to consumers before they initiated money transfers, even in instances where consumers' money transfers displayed obvious signs of fraud, such as high-dollar money transfers by elderly consumers to countries known for fraud.  Therefore, consumers often have been unaware of the risks associated with sending money through Western Union's Money Transfer System.

104.    Even after January 2011, when Western Union claimed in a written report to have implemented "a comprehensive anti-fraud program" to protect consumers, Defendants still had not adopted an adequate and effective anti-fraud program.

105.    Although, as a result of the FTC's investigation, Western Union has improved aspects of its anti-fraud program since 2012, Defendants still have not promptly terminated Agents around the world that appear to be complicit in paying out the fraud-induced money transfers, including, for example, numerous Agents in Spain that operated between January 2011 and December 2012, and were arrested by the Spanish police in 2014 for their role in laundering large sums of money received from the fraud victims. As of October 2015, Defendants rarely, if ever, terminated Agent locations for fraud in certain high-risk countries, including, but not limited to, Mexico, Nigeria, Ghana, the Dominican Republic, China, and Haiti, despite high levels of fraud and indications of complicity at Agent locations.

106.    Discovery will reveal whether Defendants' involvement in a scheme to defraud through the Western Union Money Transfer System is still ongoing.

**D.**  ***The Amount of Actual Fraud is Significantly Higher than What Was Reported in, and Subject to, the DPA.***

107.    On information and belief, the actual consumer losses due to fraud perpetrated through Western Union far exceed the approximately $500 million loss figure reported in the DPA.

108.    The losses reported in the DPA were based on information in Western Union's CFR database.  The CFR database, however, includes information representative of only a small percentage of the actual fraud perpetrated through Western Union's Money Transfer System.

109.    The majority of fraud victims do not complain directly to Western Union. Western Union's own internal reports recognize that only a small percentage of consumers complain about fraud and that the volume of fraud-induced money transfers is much higher than that reported to the Company.  For example, in several reports, Western Union has recognized that the actual amount of fraud-induced money transfers associated with agent locations was, in some cases, more than five times higher than the reported complaint figures.

110.    Further, Western Union's CFR database is incomplete because Western Union has failed to log into its CFR database all of the complaints and reports about fraud it has received, as well as all of the fraud-induced money transfers related to those complaints.

111.    Thus, the CFR database significantly understates the number of actual fraud-induced money transfers and losses.  Since January 1, 2004, it is likely that Western Union's Money Transfer System has been used to send billions of dollars in fraud-induced payments to con artists worldwide, at the expense of Plaintiffs and the other Class members.

**E.**  ***Equitable Tolling***

112.    The findings in the DPA and FTC Complaint were based on facts uniquely within Western Union's knowledge.

113.    Innocent consumers, including Plaintiffs and the other Class members, had no knowledge of the facts asserted above before the government released its findings in January 2017.  Nor did consumers, including Plaintiffs and the other Class members, have access to Western Union's internal documents that would have revealed Defendants' complicity and involvement in an overarching scheme to defraud, including Western Union's own analyses demonstrating and confirming their complicity with Fraudsters, misrepresentations to the public, and violations of BSA and FinCEN requirements.

114.    Further, Western Union continually and falsely asserted that it was an ethical and responsible business that tried to prevent fraud.  For example, Western Union affirmatively misleads consumers by representing on its website: "Western Union is dedicated to fighting fraud and helping consumers protect themselves from falling victim to fraud,"[4] and omitting that it actually does the opposite.

115.    And, as another example, in its Corporate Responsibility Report, Western Union asserted that it "stand[s] up for customers" and made false representations regarding its commitment to preventing fraud.[5]  In relevant part, Western Union falsely asserted:

a.    "We also strive to create a culture of compliance and promote ethical conduct throughout our global operations."

b.    "We seek to adhere to high standards of corporate governance.  This begins with a board of directors who are engaged and knowledgeable about our business, and committed to establishing and maintaining high standards of ethics and integrity for our Company."

---

[4]  https://www.westernunion.com/us/en/fraudawareness/fraud-home.html.

[5]  *See, e.g.*, 2014 Corporate Responsibility Report, available at https://corporate.westernunion.com/documents/WUReportInteractive_%20jul2014_%20Lowres_single.pdf.

c.      "We care about the people who use our services; we know they work hard for their money."

d.      "We also work hard to educate the public about various types of consumer fraud and how they can protect themselves."

e.      "Our tradition of consumer protection and empowerment includes fraud prevention measures, competitive services, data security and privacy measures, transparency in marketing, and a commitment to those we serve."

f.      **"**While people are critical to compliance, system controls provide an additional measure of protection. We continue to expand and improve our system controls. They are used to help monitor Agent compliance with regulatory and internal requirements and minimize the element of human error."

g.      "The GMI [Global Monitoring and Intelligence] team is trained to watch for signs of possible money laundering, fraud or terrorist financing. We monitor consumers, Agents and geographies for indications of undesirable activity and potential system abuse.  Our Financial Intelligence Unit is designed to research and investigate potential money laundering complicity by Agents and incidents of money transfer activity that could indicate money laundering.  Our approach combines data analysis and risk assessment techniques to identify and, where appropriate, act upon potentially suspicious activity."

h.      "Protecting customers from fraud is one of our priorities.   Western Union's Anti-Fraud Program emphasizes consumer education and awareness, fraud monitoring, fraud controls, and collaboration with law enforcement as well as consumer advocacy organizations."

       i.     "Consumer protection and empowerment is an issue of considerable importance to Western Union, and something we work to address on many levels."

       j.     "Western Union regularly reviews its Anti-Fraud Program and adjusts its controls to respond to evolving and emerging trends – much like law enforcement must do when confronting sophisticated and organized criminals. While technology has innumerable benefits, it also has given con artists widely expanded opportunities to scam people via email, websites and phone. Anyone can be a victim of a scam. Unfortunately, there are relationship scams aimed at people seeking companionship, lottery scams aimed at people's desire to win money and prizes, Internet purchase scams that take advantage of people who shop online, and job scams for those who are looking for work. Whether it is working to help prevent these scams or raise awareness of new ones, we take a multi-pronged approach: building consumer awareness, training our Agents, investing in technological solutions and collaborating with law enforcement."

       k.     **"**Agents are trained to help identify potential fraud victims. If an Agent suspects that the transaction is fraudulent, the Agent is trained to refuse the transaction or report it to Western Union for further investigation. Our Agents are on the front lines of customer service. Therefore we support and empower them with tools and techniques to prevent fraud by providing a variety of Agent training resources and materials through channels that include fraud kits, newsletters, fraud alerts and an online Agent Resource Center. . . . We also analyze Agent activity, along with fraud complaints received from consumers, and determine whether Agents need additional training or oversight, or if they should be suspended or even terminated. These reviews have led to program enhancements, including additional controls for transactions and additional training and support where needed."

l.      **"We employ proprietary systems, policies and procedures to help us seek to identify and stop transactions that may be fraudulent.  In addition to consumer and Agent education, Western Union has implemented a number of controls designed to stop fraudulent transactions before they are paid.  For instance, our Courtesy Callback Program is a critical component of our consumer protection efforts in some countries.  As part of this program, Western Union may try to contact senders whose transactions meet certain criteria to interview them in an attempt to determine if they are victims of fraud.  If consumer fraud is detected, the principal and fees for the money transfer are refunded to the sender."

m.      "Operating Ethically: Western Union moves money for better in more than 200 countries and territories around the world and is subject to myriad laws and regulations.  We take those requirements seriously, and strive to meet the highest standards of compliance and ethical conduct throughout our global operations. We are known and trusted by millions, and we endeavor to earn – and keep – that trust every day."

n.      "Conducting Our Business with Integrity: Western Union has been providing reliable services to consumers for more than 160 years.  Operating with integrity is of the utmost importance to us, and we believe this commitment is one key to our long-term business success.  For us, this involves maintaining respect for employees and providing them access to the tools and training they need to help them better serve our customers. . . . Like any financial institution, laws addressing consumer protection, data privacy, safety and soundness apply in jurisdictions where we do business.  We take these requirements seriously, as do our Agents.  They are a reflection of – and also supported by – our core values."

o.      "Our Core Values – Integrity - We do business each day with an absolute commitment to ethics, honesty and credibility."

33

p.    "Western Union maintains a commitment to a culture of ethics and integrity. The Western Union Code of Conduct provides guidance to employees in fulfilling their responsibility for compliance with Company policy and the laws and regulations that apply to our business around the world. Western Union sponsors multiple programs and resources for employee compliance education as well as established channels to ask questions or raise concerns. The annual performance evaluations of employees include a rating on the Culture of Compliance performance objective."

116.    *None* of these statements were true. Rather, Western Union made those statements—and also omitted and failed to disclose material facts to Plaintiffs and the other Class members—for the sole reason of misleading and deflecting any investigation into Western Union's potential culpability for the above-described fraudulent conduct.

117.    No amount of due diligence by innocent consumers, including Plaintiffs and the other Class members, could have uncovered Defendants' involvement and complicity in the systematic fraud.

118.    Indeed, as demonstrated by Plaintiffs' own conduct, as alleged herein, Western Union's customer service told them that their losses had nothing to do with Western Union and that Western Union couldn't do anything to help them.

## V.    CLASS ACTION ALLEGATIONS

119.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all others similarly situated.

120.    Plaintiffs seek to represent a Class defined as:

All consumers in the United States who were defrauded through Western Union's Money Transfer System from January 1, 2004 to the present.

121.    Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers and their immediate family members; and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

122.    This action may be brought and maintained pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and satisfies all predicate requirements thereof.

123.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).**  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are hundreds of thousands of Class members, the precise number of Class members is presently unknown to Plaintiffs, but will be determined through discovery.  Class members' names and addresses are available from Defendants' records, and Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

124.    **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    Whether Defendants sent interstate or international wires as part of a scheme to defraud;

    c.    Whether Defendants conspired to send interstate or international wires as part of a scheme to defraud;

d.      Whether Defendants participated in the conduct of an enterprise's affairs by sending interstate or international wires as part of a scheme to defraud;

e.      Whether Plaintiffs and the other Class members were damaged as a result of Defendants' scheme to defraud;

f.      Whether Defendants concealed their participation in their scheme to defraud until January 19, 2017; and

g.      The amount and nature of relief to be awarded to Plaintiffs and the other Class members.

125.    **Typicality: Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members were subjected to the same allegedly unlawful conduct and damaged in the same way by Defendants.

126.    **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation and RICO, and Plaintiffs intend to vigorously prosecute this action.  Plaintiffs and their counsel will fairly and adequately protect the Class's interests.

127.    **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to the Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

128.    **Superiority: Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy,

and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.  CLAIMS ALLEGED

### FIRST CLAIM FOR RELIEF
**Violations of 18 U.S.C. § 1962(c) and (d)**
**(Against All Defendants)**

130.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1-129 of this Complaint as though fully set forth herein.

131.    Plaintiffs bring this claim individually and on behalf of the other Class members, as defined in Paragraph 120 of this Complaint. This claim, which alleges violations of Section 1962(c) and (d) of RICO, 18 U.S.C. § 1962(c) & (d), is asserted against Defendant Hikmet Ersek and the Doe Defendants who are the directors, officers, managers, and employees of TWUC and/or WUFSI who were complicit in the intentional scheme and who, as alleged in Paragraph 27, will be specifically identified during the course of reasonable fact discovery. This claim is also asserted against Defendant TWUC and Defendant WUFSI.

132.    At all relevant times, each of the Plaintiffs, each of the other Class members, Defendant Hikmet Ersek, each of the Doe Defendants, Defendant TWUC, and Defendant

WUFSI was an individual or an entity capable of holding a legal or beneficial interest in property, which means that each of them is a "person" within the meaning of Sections 1961(3) and 1962(c) of RICO, 18 U.S.C. § 1961(3) & 1962(c).

133. **The TWUC-WUFSI Corporate Enterprise:** At all relevant times, there existed an "enterprise," within the meaning of Sections 1961(4) and 1962(c) of RICO, 18 U.S.C. § 1961(4) & 1962(c), an association-in-fact comprised of two independent entities, TWUC and WUFSI (the "TWUC-WUFSI Corporate Enterprise"). The TWUC-WUFSI Corporate Enterprise's lawful purpose was the acceptance and delivery of wire transfers in interstate and foreign commerce. The TWUC-WUFSI Corporate Enterprise's unlawful purpose was to engage in and carry out an intentional scheme to defraud users of its lawful service of vast sums of money. Its continuity was coterminous with the period of time necessary to defraud Plaintiffs and the other Class members.

134. The TWUC-WUFSI Corporate Enterprise was engaged in, and its activities affected, interstate and foreign commerce. At all relevant times, as the relevant directors, officers, managers and/or key employees, the Doe Defendants were employed by and/or associated with the TWUC-WUFSI Corporate Enterprise. In violation of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), Defendant Hikmet Ersek and the Doe Defendants conducted or participated, directly or indirectly, in the conduct of the TWUC-WUFSI Corporate Enterprise's affairs through a pattern of racketeering activity by engaging in multiple, repeated, and continuous violations of the federal wire fraud statute, 18 U.S.C. § 1343. As set forth herein, Defendant Hikmet Ersek and the Doe Defendants transmitted, or caused to be transmitted, by wires, communications of Plaintiffs and the other Class members, in interstate or foreign commerce to designated persons for ostensibly legitimate purposes, but with the actual, unlawful

purpose of engaging in an intentional scheme to defraud Plaintiffs and the other Class members of vast sums of money.

135.    In violation of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), Defendant Hikmet Ersek and the Doe Defendants conspired to violate Section 1962(c) of RICO.

136.    **The Western Union Money Transfer Enterprise:**    In the alternative, at all relevant times, there existed an "enterprise," within the meaning of Sections 1961(4) and 1962(c) of RICO, 18 U.S.C. § 1961(4) & 1962(c), to wit, an association-in-fact comprised of TWUC, WUFSI, and the Independent Agents.  The Western Union Money Transfer Enterprise's lawful purpose was the acceptance and delivery of wire transfers in interstate and foreign commerce. The Western Union Money Transfer Enterprise' unlawful purpose was to engage in and carry out an intentional scheme to defraud users of its lawful service of vast sums of money.  Its continuity was coterminous with the period of time necessary to defraud Plaintiffs and the other Class members.

137.    The Western Union Money Transfer Enterprise was engaged in, and its activities affected, interstate and foreign commerce.    At all relevant times, Defendant TWUC and Defendant WUFSI were employed by and/or associated with the Western Union Money Transfer Enterprise.  In violation of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), Defendant TWUC and Defendant WUFSI conducted or participated, directly or indirectly, in the conduct of the affairs of the Western Union Money Transfer Enterprise through a pattern of racketeering activity by engaging in multiple, repeated, and continuous violations of the federal wire fraud statute, 18 U.S.C. § 1343.    As set forth herein, Defendant TWUC and Defendant WUFSI transmitted, or caused to be transmitted, by wires, communications of Plaintiffs and the other Class members, in interstate or foreign commerce to designated persons for ostensibly legitimate

purposes, but with the actual, unlawful purpose of engaging in an intentional scheme to defraud Plaintiffs and the other Class members of vast sums of money.

138.    In violation of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), Defendant TWUC and Defendant WUFSI conspired to violate Section 1962(c) of RICO.

139.    At all relevant times, the Western Union Corporate Enterprise and the Western Union Money Transfer Enterprise were engaged in, and their activities affected, both interstate and foreign commerce.

140.    By reason of the above-referenced violations of Section 1962(c) and (d) of RICO, 18 U.S.C. § 1962(c) & (d), Plaintiffs and the other Class members have been injured in their business or property within 18 U.S.§ 1964(c) of RICO, and Plaintiffs and the other Class members are entitled to assert this claim and recover threefold the damages they sustained and the cost of the suit, including reasonable attorneys' fees, and other appropriate relief.

**SECOND CLAIM FOR RELIEF**
**Violations of 18 U.S.C. § 1962(b) and (d)**
**(Against Defendant TWUC and Defendant WUFSI)**

141.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1-129 of this Complaint as though fully set forth herein.

142.    Plaintiffs bring this claim individually and on behalf of the other members of the Class, as defined in Paragraph 120 of this Complaint.  This claim, which alleges violations of Section 1962(b) and (d) of RICO, 18 U.S.C. § 1962(b) & (d), is asserted against Defendant TWUC and Defendant WUFSI.

143.    At all relevant times, each of the Plaintiffs, each of the other Class members, Defendant TWUC, and Defendant WUFSI was an individual or an entity capable of holding a

legal or beneficial interest in property, which means that each of them is a "person" within the meaning of Sections 1961(3) and 1962(c) of RICO, 18 U.S.C. § 1961(3) & 1962(c).

144. At all relevant times, each of the Plaintiffs and each of the other Class members who was an "individual" or a "legal entity" was an "enterprise" within the meaning of Sections 1961(4) and 1962(b) of RICO, 18 U.S.C. § 1961(4) & 1962(b).

145. Each of the Plaintiffs and each of the other Class members was engaged in interstate or foreign commerce when he, she, or it wired money through Western Union's Money Transfer System.

146. As set forth herein, Defendant TWUC and Defendant WUFSI transmitted, or caused to be transmitted, by wires, communications of Plaintiffs and the other Class members, in interstate or foreign commerce to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of facilitating an intentional scheme to defraud Plaintiffs and the other Class members of vast sums of money.

147. As set forth herein, Defendant TWUC and Defendant WUFSI engaged in a pattern of racketeering activity by engaging in multiple, repeated, and continuous violations of the federal wire fraud statute.

148. In violation of Section 1962(b) of RICO, 18 U.S.C. § 1962(b), and through the above-referenced pattern of racketeering activity, Defendant TWUC and Defendant WUFSI acquired an interest (proceeds) of the enterprise—to wit, Plaintiffs and the other Class members— when they caused Plaintiffs and the other Class members to enter into transactions that they otherwise would not have entered into.

149. In violation of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), Defendant TWUC and Defendant WUFSI conspired to violate Section 1962(b) of RICO.

150.    By reason of the above-referenced violations of Section 1962(b) and (d) of RICO, 18 U.S.C. § 1962(b) & (d), Plaintiffs and the other Class members have been injured in their business or property within 18 U.S.§ 1964(c) of RICO, and Plaintiffs and the other Class members are entitled to assert this claim and recover threefold the damages they sustained and the cost of the suit, including reasonable attorneys' fees, and other appropriate relief.

### THIRD CLAIM FOR RELIEF
**Violations of Colo. Rev. Stat. Ann. § 18-17-104(3) and (4)**
**(Against All Defendants)**

151.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1-129 of this Complaint as though fully set forth herein.

152.    Plaintiffs bring this claim individually and on behalf of the other members of the Class, as defined in Paragraph 120 of this Complaint.  This claim, which alleges violations of Section 18-17-104(3) and (4) of the Colorado Organized Crime Control Statute ("COCCA"), Colo. Rev. Stat. Ann. § 18-17-104(3) & (4), is asserted against Defendant Hikmet Ersek and the Doe Defendants who are the relevant directors, officers, managers, and employees of TWUC and/or WUFSI who were knowingly complicit in the intentional scheme to defraud and who, as alleged in Paragraph 27, will be specifically identified during the course of reasonable fact discovery.  This claim is also asserted against Defendant TWUC and Defendant WUFSI.

153.    At all relevant times, each of the Plaintiffs, each of the other Class members, Defendant Hikmet Ersek, each of the Doe Defendants, Defendant TWUC, and Defendant WUFSI was an individual or an entity capable of holding a legal or beneficial interest in property, which means that each of them is a "person" within the meaning of Sections 18-17-103(4) and 18-17-104(3) of COCCA.

154.    **The TWUC-WUFSI Corporate Enterprise:**  At all relevant times, there existed an "enterprise," within the meaning of Sections 18-17-103(2) and 18-17-104(3) of COCCA—to wit, an association-in-fact comprised of two independent entities, TWUC and WUFSI (the "TWUC-WUFSI Corporate Enterprise").  The TWUC-WUFSI Corporate Enterprise's lawful purpose was the acceptance and delivery of wire transfers in interstate and foreign commerce. The TWUC-WUFSI Corporate Enterprise's unlawful purpose was to engage in and carry out an intentional scheme to defraud users of its lawful service of vast sums of money.  Its continuity was coterminous with the period of time necessary to defraud Plaintiffs and the other Class members.  At all relevant times, as the relevant directors, officers, managers and/or key employees, Defendant Hikmet Ersek and the Doe Defendants were employed by and/or associated with the TWUC-WUFSI Corporate Enterprise.  In violation of Section 18-17-104(3) of COCCA, Defendant Hikmet Ersek and the Doe Defendants knowingly conducted or participated, directly or indirectly, in the TWUC-WUFSI Corporate Enterprise through a pattern of racketeering activity related to the enterprise by engaging in multiple and repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343.  As set forth herein, Defendant Hikmet Ersek and the Doe Defendants transmitted, or caused to be transmitted, by wires, communications of Plaintiffs and the other Class members, in interstate or foreign commerce to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of facilitating an intentional scheme to defraud Plaintiffs and the other Class members of vast sums of money.

155.    In violation of Section 18-17-104(4) of COCCA, Defendant Hikmet Ersek and the Doe Defendants conspired to violate Section 18-17-104(3) of COCCA.

156.    **The Western Union Money Transfer Enterprise:**  In the alternative, at all relevant times, there existed an "enterprise," within the meaning of Sections 18-17-103(2) and

18-17-104(3) of COCCA—to wit, an association-in-fact comprised of TWUC, WUFSI, and the Independent Agents. The Western Union Money Transfer Enterprise's lawful purpose was the acceptance and delivery of wire transfers in interstate and foreign commerce. The Western Union Money Transfer Enterprise's unlawful purpose was to engage in and carry out an intentional scheme to defraud users of its lawful service of vast sums of money. Its continuity was coterminous with the period of time necessary to defraud Plaintiffs and the other Class members. At all relevant times, Defendant TWUC and Defendant WUFSI were employed by and/or associated with the Western Union Money Transfer Enterprise. In violation of Section 18-17-104(3) of COCCA, Defendant TWUC and Defendant WUFSI conducted or participated, directly or indirectly, in such Western Union Money Transfer Enterprise through a pattern of racketeering activity related to the enterprise by knowingly engaging in multiple and repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343. As set forth herein, Defendant TWUC and Defendant WUFSI transmitted, or caused to be transmitted, by wires, communications of Plaintiffs and the other Class members in interstate or foreign commerce to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of engaging an intentional scheme to defraud Plaintiffs and the other Class members of vast sums of money.

157.    In violation of Section 18-17-104(4) of COCCA, Defendant TWUC and Defendant WUFSI conspired to violate Section 18-17-104(3) of COCCA.

158.    By reason of the above-referenced violations of Section 18-17-104(3) and (4) of COCCA, Plaintiffs and the other Class members have been injured within Section 18-17-106(7) of COCCA, and Plaintiffs and the other Class members are entitled to assert this claim and

recover threefold the damages they sustained and the cost of the suit, including reasonable attorneys' fees, and other appropriate relief.

**FOURTH CLAIM FOR RELIEF**
**Violations of Colo. Rev. Stat. Ann. § 18-17-104(2) and (4)**
**(Against Defendant TWUC and Defendant WUFSI)**

159.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1-129 of this Complaint as though fully set forth herein.

160.    Plaintiffs bring this claim individually and on behalf of the other members of the Class, as defined in Paragraph 121 of this Complaint.  This claim, which alleges violations of Section 18-17-104(2) and (4) of COCCA, is asserted against Defendant TWUC and Defendant WUFSI.

161.    At all relevant times, each of the Plaintiffs, each of the other Class members, Defendant TWUC, and Defendant WUFSI was an individual or an entity capable of holding a legal or beneficial interest in property, which means that each of them is a "person" within the meaning of Sections 18-17-103(4) and 18-17-104(2) of COCCA.

162.    At all relevant times, each of the Plaintiffs and each of the other Class members who was an "individual" or a "legal entity" was an "enterprise" within the meaning of Sections 18-17-103(2) and 18-17-104(2) of COCCA.

163.    As set forth herein, Defendant TWUC and Defendant WUFSI transmitted, or caused to be transmitted, by wires, communications of Plaintiffs and Class members, in interstate or foreign commerce to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of facilitating an intentional scheme to defraud Plaintiffs and the other Class members of vast sums of money.

164.    As set forth herein, Defendant TWUC and Defendant WUFSI knowingly engaged in a pattern of racketeering activity related to the enterprise by engaging in multiple and repeated violations of the federal wire fraud statute.

165.    In violation of Section 18-17-104(2) of COCCA, and through the above-referenced pattern of racketeering activity, Defendant TWUC and Defendant WUFSI acquired an interest (proceeds) of the enterprise—to wit, Plaintiffs and the other Class members—when they caused Plaintiffs and the other Class members to enter into transactions that they otherwise would not have entered into.

166.    In violation of Section 18-17-104(4) of COCCA, Defendant TWUC and Defendant WUFSI conspired to violate Section 18-17-104(2) of COCCA.

167.    By reason of the above-referenced violations of Sections 18-17-104(2) and (4) of COCCA, Plaintiffs and the other Class members have been injured in their business or property within Section 18-17-106(7) of COCCA, and Plaintiffs and the other Class members are entitled to assert this claim and recover threefold the damages they sustained and the cost of the suit, including reasonable attorneys' fees, and other appropriate relief.

**FIFTH CLAIM FOR RELIEF**
**Violations of Colo. Rev. Stat. § 18-4-405**
**(Against Defendant TWUC and Defendant WUFSI)**

168.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1-129, above, as though fully set forth herein.

169.    Plaintiffs bring this claim individually and on behalf of the other members of the Class, as defined in Paragraph 120 of this Complaint.  This claim for civil theft, pursuant to Colo. Rev. Stat. § 18-4-405, is asserted against Defendant TWUC and Defendant WUFSI.

170.    Defendant TWUC and Defendant WUFSI knowingly obtained and exercised control over monies belonging to Plaintiffs and the other Class members.  Defendant TWUC and Defendant WUFSI knowingly obtained and exercised control over monies provided by Plaintiffs and the other Class members to be transferred using Western Union's Money Transfer System. Defendant TWUC and Defendant WUFSI knowingly obtained and exercised control over fees paid by Plaintiffs and the other Class members in connection with the transfer of money through Western Union's Money Transfer System.

171.    Defendant TWUC and Defendant WUFSI's control over monies belonging to Plaintiffs and the other Class members was unauthorized, and achieved through deception, because Defendant TWUC and Defendant WUFSI collected the monies under the false pretense that they would be facilitating a legitimate transfer through Western Union's Money Transfer System.  Plaintiffs and the other Class members did not authorize Defendant TWUC and Defendant WFUSI to transfer monies to third-party Fraudsters or collect fees for the transfer of money to third-party Fraudsters.

172.    By transferring monies to third-party Fraudsters, and keeping fees collected in connection with the transfer of money to third-party Fraudsters, Defendant TWUC and Defendant WUFSI, knowingly and intentionally, permanently deprived Plaintiffs and the other Class members of their monies, and of the use and benefit of their monies.

173.    As a direct and proximate result of Defendant TWUC and Defendant WUFSI's misconduct, Plaintiffs and the other Class members have incurred damages in an amount to be determined at trial.  Pursuant to Colo. Rev. Stat. § 18-4-405, Plaintiffs and the other Class members are entitled to three times the amount of actual damages sustained, as well as the cost of the suit and reasonable attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**Negligence**
**(Against Defendant TWUC and Defendant WUFSI)**

174.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1-129, above, as though fully set forth herein.

175.    Plaintiffs bring this claim individually and on behalf of the other members of the Class, as defined in Paragraph 120 of this Complaint.  This claim, which alleges common law negligence, is asserted against Defendant TWUC and Defendant WUFSI.

176.    Defendant TWUC and Defendant WUFSI were aware that the Western Union Money Transfer System was used for rampant fraud and deceit.

177.    Defendant TWUC and Defendant WUFSI each had a duty of care to consumers, including Plaintiffs and the other Class members, transmitting money through the Western Union Money Transfer System.

178.    Defendant TWUC and Defendant WUFSI could foresee that there was an unreasonably high probability that its customers, including Plaintiffs and the other Class members, would be defrauded by third-party Fraudsters if they did not implement reasonable anti-fraud measures, including complying with FinCEN and BSA requirements.

179.    Defendant TWUC and Defendant WUFSI failed to implement reasonable anti-fraud measures, including complying with FinCEN and BSA requirements.

180.    Due to Defendant TWUC's and Defendant WUFSI's failure to implement reasonable anti-fraud measures, including complying with FinCEN and BSA requirements, Plaintiffs and the other Class members suffered financial harm.

181.    As a direct and proximate result of Defendant TWUC's and Defendant WUFSI's negligence, Plaintiffs and the other Class members have incurred damages in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against Defendant TWUC and Defendant WUFSI)**

182.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1-129, above, as though fully set forth herein.

183.    Plaintiffs bring this claim individually and on behalf of the other members of the Class, as defined in Paragraph 120 of this Complaint.  This unjust enrichment claim is asserted against Defendant TWUC and Defendant WUFSI.

184.    Plaintiffs and the other Class members conferred a benefit on Defendant TWUC and Defendant WUFSI when they paid fees to Defendant TWUC and Defendant WUFSI for the transfer of money to third-party Fraudsters through Western Union's Money Transfer System.

185.    Defendant TWUC and Defendant WUFSI have retained the benefit conferred by Plaintiffs and the other Class members.

186.    Plaintiffs and the other Class members received nothing in return for the benefit conferred on Defendant TWUC and Defendant WUFSI.

187.    Defendant TWUC and Defendant WUFSI were complicit in, and/or acted recklessly and negligently with respect to, the systemic fraud being perpetrated through the Western Union Money Transfer System.

188.    Plaintiffs and the other Class members were unaware that Defendant TWUC and Defendant WUFSI was complicit in, and/or acted recklessly and negligently with respect to, the systemic fraud being perpetrated through the Western Union Money Transfer System.

189.    Defendant TWUC and Defendant WUFSI knowingly accepted the unjust benefits of its wrongful conduct, and it is inequitable and unconscionable for Defendant TWUC and Defendant WUFSI to retain these benefits.  As a result of Defendant TWUC's and Defendant WUFSI's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the other Class members in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### Conversion
### (Against Defendant TWUC and Defendant WUFSI)

190.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1-129, above, as though fully set forth herein.

191.    Plaintiffs bring this claim individually and on behalf of the other members of the Class, as defined in Paragraph 120 of this Complaint.  This conversion claim is asserted against Defendant TWUC and Defendant WUFSI.

192.    Defendant TWUC and Defendant WUFSI exercised dominion and control over monies belonging to Plaintiffs and the other Class members.  Defendant TWUC and Defendant WUFSI exercised dominion and control over monies provided by Plaintiffs and the other Class members to be transferred using Western Union's Money Transfer System.  Defendant TWUC and Defendant WUFSI also exercised dominion and control over fees paid by Plaintiffs and the other Class members in connection with the transfer of money through Western Union's Money Transfer System.

193.    Defendant TWUC and Defendant WUFSI's dominion and control over monies belonging to Plaintiffs and the other Class members was unauthorized because Defendant TWUC and Defendant WUFSI collected the monies under the false pretense that they would be facilitating a legitimate transfer through Western Union's Money Transfer System.  Plaintiffs

and the other Class members did not authorize Defendant TWUC and Defendant WFUSI to transfer monies to third-party Fraudsters or collect fees for the transfer of money to third-party Fraudsters.

194.    By transferring monies to third-party Fraudsters, and keeping fees collected in connection with the transfer of money to third-party Fraudsters, Defendant TWUC and Defendant WUFSI wrongfully deprived Plaintiffs and the other Class members of their property.

195.    Defendant TWUC and Defendant WUFSI have completed conversion of the monies collected from Plaintiffs and the other Class members.

196.    As a direct and proximate result of Defendant TWUC and Defendant WUFSI's misconduct, Plaintiffs and the other Class members have incurred damages in an amount to be determined at trial.

## VII.  JURY DEMAND

Plaintiffs demand a trial by jury.

## VIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, on each claim for relief as follows:

1.    Declaring that this action is a proper class action, certifying the Class, as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

2.    Enjoining Defendants from continuing to engage in the illegal practices described herein;

3.       Ordering Defendants to pay actual, statutory, treble, and punitive damages to Plaintiffs and the other Class members, as allowable by law;

4.       Ordering Defendants to pay restitution to Plaintiffs and the other Class members, as allowable by law;

5.       Ordering Defendants to provide an accounting to Plaintiffs and the other Class members, and to disgorge all proceeds illegally obtained by the Defendants and for which they were unjustly enriched;

6.       Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

7.       Ordering Defendants to pay attorneys' fees and costs of suit; and

8.       Ordering such other and further relief as may be just and proper.

Dated:  April 26, 2018

Respectfully submitted,

*s/ Ty Gee*
Ty Gee
**HADDON, MORGAN AND FOREMAN P.C.**
150 East 10th Avenue
Denver, Colorado  80203
Telephone: 303-831-7364
tgee@hmflaw.com

Adam J. Levitt (*pro hac vice* motion to be filed)
Daniel R. Ferri (*pro hac vice* motion to be filed)
**DICELLO LEVITT & CASEY LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dlcfirm.com
dferri@dlcfirm.com

Kevin P. Roddy (pro hac vice motion to be filed)
**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey  07095
Telephone: 732-636-8000
kroddy@wilentz.com

Kenneth S. Canfield
**DOFFERMYRE SHIELDS CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, Suite 1900
Atlanta, Georgia  30309
Telephone: 404-881-8900
kcanfield@dsckd.com

G. Robert Blakey (*pro hac vice* motion to be filed)
**WILLIAM J. & DOROTHY T. O'NEILL PROFESSOR OF LAW EMERITUS NOTRE DAME LAW SCHOOL***
7002 East San Miguel Avenue
Paradise Valley, Arizona  85253
Telephone:  574-514-8220
blakey.1@nd.edu
*For purposes of identification only

***Counsel for Plaintiffs and the Proposed Class***